UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 4/12/2017 __

STEPHANIE WESLEY,

                                            Plaintiff,                    16-CV-04882 (GBD)(SN)

                    -against-                                            **REPORT AND**
                                                                        **RECOMMENDATION**
COMMISSIONER OF SOCIAL SECURITY,

                                            Defendant.
---------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

Stephanie Wesley seeks judicial review, under 42 U.S.C. § 405(g), of the Commissioner

of Social Security's denial of her application for Supplemental Security Income ("SSI")

disability payments. Wesley claims that a combination of bipolar disorder, depression, anxiety,

migraine headaches, and loss of impulse control prevent her from working in any capacity. An

Administrative Law Judge ("ALJ") determined that the medical evidence did not support

Wesley's account of her symptoms' severity, rejected the opinion of a treating source which

supported Wesley's claims, and credited the testimony of consultative examiners who believed

that Wesley could work within specified limitations. The ALJ concluded that Wesley's mental

impairments did not preclude her from simple, routine work with no contact with the public and

minimal contact with supervisors and coworkers.

Wesley and the Commissioner cross-move for judgment on the pleadings under Federal

Rule of Civil Procedure 12(c). I conclude that the ALJ's application of the treating physician rule

and disability determination were supported by substantial evidence and free from legal error.

Accordingly, I recommend granting judgment in favor of the Commissioner and denying Wesley's cross-motion.

# BACKGROUND

## I. Evidence in the Administrative Record

On February 12, 2013, Wesley applied for SSI, alleging disability due to bipolar disorder, depression, anxiety, migraine headaches, and loss of impulse control. Her application was denied on May 15, 2013. She requested a hearing on June 14, 2013. ALJ Elias Feuer conducted a hearing on May 14, 2014, where Wesley appeared and was represented by counsel. The ALJ rendered a decision on November 24, 2014, that Wesley was not disabled. This decision became the Commissioner's final decision when the Appeals Council denied review on June 9, 2016. The following summarizes the evidence heard by the ALJ and later submitted to the Appeals Council.

### A. Wesley's Testimony

Wesley testified that because of her bipolar disorder, she was irritable, hostile and aggressive when manic, with poor memory, poor concentration, crying, and sleeping "spells" (i.e., oversleeping). She often started tasks that she was not able to complete. She stayed home, withdrew from people, and did not have friends. Wesley experienced hallucinations, testifying that she had over 100 hallucinations in 2014. Since 2012, she began talking to her hallucinations. Because of her anxiety, she would hyperventilate and experience panic attacks, though she denied ever feeling like she was having a heart attack. She had never been hospitalized. At the time of the hearing, she was taking Seroquel to treat bipolar disorder and Buspar for anxiety. She was also receiving treatment from a psychiatrist, Dr. Virginia Contreras, and a psychotherapist, Cecilia Branas.

Her last job was in 2007 as a seasonal groundskeeper for the City of New York. She had not looked for work since then because of her depression. As a means of coping with her depression, bipolar disorder, and anxiety, she would oversleep.

## B. Medical History

### 1. Pre-Application Evidence

In January 2013 (she applied for SSI in February 2013), Wesley visited Dr. Kyra Blatt, complaining of headaches. Dr. Blatt diagnosed her with migraine headaches and recommended obtaining an MRI scan of the head.

### 2. Post-Application Evidence

#### a) Dr. Virginia Contreras

Wesley first began seeing Dr. Contreras, psychiatrist, in February 2010. See Administrative Record ("AR") at 280. In February 2013, Wesley reported to Dr. Contreras that she was continuing to attend individual therapy sessions with her psychotherapist, Ms. Branas. Dr. Contreras noted that Wesley was "coping better with all of her life issues" and that her general outlook was "improved." Id. at 292.

During a follow-up visit on May 1, 2013, Wesley reported having nightmares relating to past incidents of domestic violence. Wesley was depressed and tearful but denied suicidal or homicidal ideation. See id. at 293. Dr. Contreras advised Wesley to "start reading self help books and employ positive thinking techniques given in the past." Id.

Dr. Contreras reported Wesley as stable as of August 1, 2013. See AR at 294. Despite this assessment, in her Medical Source Statement of Ability to do Work-Related Activities ("Medical Source Statement") completed that same day, Dr. Contreras opined that Wesley had "marked" limitations in all functional areas. Id. at 276–77. These areas included the ability to

understand, remember, and carry out simple instructions; to understand, remember, and carry out complex instructions; to interact with the public, supervisors, and co-workers; and to respond appropriately to work situations and changes in a routine work setting. Id. The basis for the "marked" limitations was Wesley's PHQ-9 score[1] of 17, results of a psychiatric assessment, and laboratory testing showing hyperthyroidism and a vitamin D deficiency.

Dr. Contreras again assessed Wesley's condition as stable at a January 30, 2014 follow-up appointment. Dr. Contreras observed that Wesley was alert and oriented and had a full range of affect and coherent speech. Wesley requested a letter for her SSI application stating that she was compliant with treatment.

In a second Medical Source Statement signed on April 4, 2014, Dr. Contreras assessed Wesley as having "extreme" loss in her capacity to interact appropriately with the public; ask simple questions; accept instructions and respond appropriately to criticisms; get along with coworkers; maintain socially appropriate behavior; respond appropriately to changes in a routine work setting; travel in unfamiliar places; carry out detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance; sustain an ordinary routine; deal with stress; work in coordination with or in proximity to others; complete a normal workday without interruptions; and perform at a consistent pace. See id. at 299–300. Dr. Contreras also opined that Wesley had "marked" limitations in activities of daily living, maintaining social functioning, and understanding detailed instructions. Id. Dr. Contreras, however, assessed only "moderate" or "mild" losses in understanding, remembering, and carrying out short, simple instructions, as well as making simple, work-related decisions. Id. at 300. Regarding the length

---

[1] The PHQ-9 is used to screen, diagnose, monitor, and measure the severity of depression. PHQ-9 scores of 5, 10, 15, and 20 represent mild, moderate, moderately severe, and severe depression, respectively.

of Wesley's condition, Dr. Contreras noted that her symptoms had persisted since February 2010. Id. at 301.

### b) Cecilia Branas

The first documented visit that Wesley had with Ms. Branas was in February 2013. AR at 184, 315. Ms. Branas asserted that Wesley continued to report social withdrawal. During two appointments in March 2013, Wesley reported a depressed mood and experiencing an episode in which she felt like the walls were closing in around her. Almost a year later, on February 24, 2014, Wesley complained of depression to Ms. Branas but reported no other symptoms. In March 2014, she reported feeling sadness over her brother's recent death. In April and May 2014, she indicated that she was anxious with regards to some kind of court activity in connection with her brother's death (further details are not evident from the record).

Ms. Branas completed a Medical Source Statement on May 5, 2014, that is identical in substance to the Medical Source Statement completed by Dr. Contreras on April 4, 2014. In response to how long Wesley's condition had lasted, Ms. Branas answered simply, "Yes." Id. at 337.

### c) Dr. Kyra Blatt

Wesley visited Dr. Blatt in February 2013 for a follow-up after an initial appointment in January 2013. Wesley informed Dr. Blatt she had driven her daughter to and from school that day. Dr. Blatt's examination findings were again unremarkable. Dr. Blatt also noted that a brain MRI had not yet been performed.

### 3. Consultative Examinations

#### a) Dr. Arlene Broska

Dr. Broska performed a psychiatric consultative examination of Wesley in connection with her SSI claim on April 16, 2013. Wesley was able to travel to the appointment by herself. She reported no psychiatric hospitalizations. Regarding her current functioning, Dr. Broska noted that Wesley had difficulty sleeping; became irritable and angry very quickly; experienced frequent mood changes and corresponding changes in energy; was easily distracted and forgetful (particularly in taking her medication); would get into physical altercations (her last fight was in March 2013); and would feel suffocated.

Upon performing a mental status examination, Dr. Broska found that Wesley's "manner of relating, social skills, and overall presentation were fair." AR at 234. Her thinking was coherent and goal directed, with no evidence of hallucinations, delusions or paranoia. See id. Although Wesley's attention and concentration, as well as recent and remote memory skills, were "mildly impaired," she was able to do "counting, simple calculations, and forward by three." Id. at 235. Her insight and judgment were rated as "fair" and "fair to poor." Id.

According to Dr. Broska, in terms of Wesley's daily functioning ability, she was able to dress, bathe, and groom herself regularly; she cooked three times a week, occasionally cleaned, and did laundry two times a week; she managed her own money; she was able to use public transportation independently; and she read and watched television. Wesley reported that she performed activities of daily living but did them less frequently during downswings in her mood. Dr. Broska also noted that Wesley was able to manage her own funds.

Dr. Broska concluded that there was (1) "no evidence of limitation in the claimant's following and understanding simple directions and instructions, perform simple and complex

tasks independently"; (2) "mild limitation in her ability to maintain attention and concentration and learn new tasks"; (3) "mild to moderate limitation in her ability to make appropriate decisions, relate adequately with others, and appropriately deal with" others; and (4) "moderate limitation in her ability to maintain a regular schedule." Id. at 235–36. Dr. Broska assessed a prognosis of "fair" and recommended that Wesley continue with mental health treatment. Id. at 236.

### b) Dr. Marilee Mescon

On April 16, 2013, Wesley saw Dr. Mescon for a consultative internal medicine examination. Wesley's chief complaint was headaches, which had persisted for the past four months and typically lasted for two or three days to a week without stopping. She denied any history of head injury and mentioned that she had never had a CT or MRI scan of her head. Regarding activities of daily living, Wesley was able to "cook, clean, do the laundry, shop, shower, bathe, and dress." AR at 229. Dr. Mescon reported that Wesley "appeared to be in no acute distress" and that all other examination findings appeared unremarkable. Id.

Dr. Mescon concluded that there were "no limitations in the claimant's ability to sit, stand, climb, push, pull, or carry heavy objections. Id. at 230.

### c) Dr. T. Harding

State agency psychiatrist Dr. Harding reviewed Wesley's mental health treatment records and the findings and conclusions of Dr. Broska. In a report dated May 14, 2013, Dr. Harding concluded that based on his review, Wesley was "able to understand, execute, and remember simple instructions and work-like procedures," "maintain attention and concentration for at least 2 hour intervals," and sustain a normal workday and maintain a consistent pace. AR at 107–08. He also opined that Wesley would be able to "adapt to changes in a routine work setting and can

use judgment to make simple work-related decisions in a low contact personal setting." Id. at 108. Dr. Harding noted, however, that Wesley would have difficulty working with supervisors and coworkers, as well as difficulty in dealing with the public. See id.

**4. Vocational Expert**

At the May 14, 2014 administrative hearing, the ALJ presented vocational expert Yaakov Taitz with a hypothetical claimant with the following characteristics: an individual of Wesley's age, education, and work experience, with no exertional limitations, limited to performing jobs involving simple, routine, and repetitive tasks with only occasional changes in the work setting and occasional interaction with the general public. See AR at 69. Mr. Taitz responded that at the medium skill level, the claimant could work as a cleaner in a hospital setting or a cleaner in an industrial setting, and that at the light skill level, the claimant could work as a mail clerk or a marker.

The ALJ then presented another hypothetical to Mr. Taitz, in which the claimant possessed the same characteristics as in the situation above, except that she could tolerate no contact with the general public and only occasional contact with supervisors and coworkers, and could not work in tandem with coworkers (i.e., no assembly line work). Mr. Taitz answered that there were no jobs available for such a claimant.

The ALJ's last hypothetical asked Mr. Taitz to consider a claimant who had problems focusing sufficiently and getting to work, was off task 15% percent of the time, and had one unscheduled absence per month. Mr. Taitz responded that there would be no jobs in the national economy that such an individual could perform and that it would be difficult for an individual to sustain employment with two or more absences per month.

## II.    Procedural History

### A.  The Commissioner's Decision

The ALJ found that Wesley suffered from medical impairments including bipolar disorder, depression, and anxiety but not headaches. He concluded that she did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. According to the ALJ, Wesley had mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence or pace. Wesley experienced no episodes of decompensation.

Based on his review of the record, the ALJ determined that Wesley had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: she could perform simple, routine, and repetitive tasks with occasional changes in work setting; she could not perform assembly line work; and she could have no contact with the general public and only occasional contact with supervisors or co-workers with whom she could not work in tandem. AR at 15. The ALJ concluded that Wesley was not "disabled" within the meaning of the Social Security Act, based on her residual functional capacity, age, education, and work experience. Accordingly, he denied Wesley's application for SSI, finding her not disabled from February 12, 2013 (the date the application was filed) through the date of the decision. The Appeals Council denied Wesley's request for a review and the ALJ's decision became the final decision of the Commissioner.

### B.  These Proceedings

Wesley seeks review of the Commissioner's decision under 42 U.S.C. § 405(g) and moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). She attacks the ALJ's application of the treating physician rule, arguing that the ALJ overestimated her

ability to sustain full-time employment. According to Wesley, the ALJ assigned too much weight to Dr. Broska's conclusion and insufficient weight to Dr. Contreras's and Ms. Branas's opinions, and failed to consider possible side effects of the medications that she was taking. Wesley also contends that the ALJ failed to provide jobs available in the national economy that were actually compatible with his RFC. The Commissioner cross-moves for judgment on the pleadings arguing that the ALJ's decision was supported by substantial evidence and free from legal error.

## DISCUSSION

**I.      Standard of Review**

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Pursuant to 42 U.S.C. § 405(g), however, the factual findings of the Commissioner are conclusive when they are supported by substantial evidence. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). "[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Comm'r of Soc. Sec., 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and emphasis omitted).

Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.      Definition of Disability

The Social Security Act defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant is determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 416.920(a)(4). The steps are

followed in sequential order. If it is determined that the claimant is not disabled at a step of the

evaluation process, the evaluation will not progress to the next step. The Court of Appeals has

described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not,
> the Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R.
> Pt. 404, subpt. P, app. 1 [(the "Listings")] . . . . Assuming the
> claimant does not have a listed impairment, the fourth inquiry is
> whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform her past work. Finally, if the
> claimant is unable to perform his past work, the burden then shifts
> to the Commissioner to determine whether there is other work which
> the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). "The Social

Security regulations define residual functional capacity as the most the claimant can still do in a

work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d

409, 418 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the

sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

## III.     Treating Source Rule and Residual Functional Capacity

Wesley argues that the ALJ committed an error of law by incorrectly weighing the

opinions of Dr. Contreras, Dr. Broska, Dr. Harding, and Ms. Branas. According to Wesley, this

error caused the ALJ to overlook her significant psychological limitations and to overestimate

her ability to sustain full-time employment. At Step Four, the ALJ determined that Wesley had

the residual functional capacity to perform simple, routine, and repetitive tasks with occasional

changes in the work setting, no contact with the general public, and occasional interaction with

supervisors and coworkers, with no working in tandem with coworkers and no assembly line

work. See AR at 70–71. But Wesley's treating source, Dr. Contreras, assessed "marked" limitations for almost all areas of functioning (as did her therapist, Ms. Branas). Wesley claims that had the ALJ credited Dr. Contreras's opinion, his assessment of Wesley's residual functional capacity would have been different.

The Social Security regulations require the ALJ to give controlling weight to the opinions of "treating sources" when those opinions are well-supported by medical evidence and "not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). Treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of impairments and may "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." Id. A treating physician's opinion is generally entitled to "some extra weight" because "the treating source is inherently more familiar with a claimant's medical condition than are other sources." Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988). But "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Halloran, 362 F.3d at 32 (treating source opinion not entitled to controlling weight where it is inconsistent with other record evidence).

When the ALJ discredits the opinion of a treating physician, he must follow a structured evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014). The ALJ must consider: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of the treating physician's opinion with the record as a whole; (5) the specialization of the physician in contrast

to the condition being treated; and (6) any other significant factors. See 20 C.F.R.

§ 416.927(c)(2)–(6); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) ("In order to override the opinion of a treating physician . . . the ALJ must explicitly consider [the aforementioned factors]."). This process must be transparent: the regulations require the Commissioner to "always give good reasons in our notice of determination or decision for the weight we will give your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Where an ALJ does not credit a treating physician's findings, the claimant is entitled to an explanation. See Snell, 177 F.3d at 134. "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Greek v. Colvin, 820 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted).

The ALJ properly gave Dr. Contreras's opinion on Wesley's marked limitations "very little weight" because it was not supported by the medical evidence of record as a whole, including Dr. Contreras's own treatment notes, which failed to document significant mental limitations. On August 1, 2013, Dr. Contreras opined that Wesley had marked or extreme limitations in almost every category of vocational functioning, including maintaining concentration for two-hour segments, carrying out detailed instructions, sustaining an ordinary routine, dealing with the stress of skilled and semi-skilled work, and maintaining regular attendance. On April 14, 2014, Dr. Contreras again assessed marked or extreme limitations in almost all aspects of vocational functioning, except for remembering and carrying out simple instructions (which was assessed as "no/mild loss").

But these findings of marked limitations in functioning are not supported by Dr. Contreras's treatment notes. For example, in February 2013, Dr. Contreras noted that Wesley was "improved" and coping better with life issues. AR at 292. Then, in May 2013, in response to

Wesley's complaints of depression and nightmares, Dr. Contreras merely recommended reading self-help books and utilizing positive thinking tools. Wesley then returned to Dr. Contreras in August 2013, reporting that the self-help books had stabilized her condition. Dr. Contreras described her condition at the time as "stable." Id. at 294–95. Furthermore, Dr. Contreras did not note any complaint of hallucinations at these appointments. During the next visit in January 2014, Dr. Contreras once again assessed Wesley's condition as "stable" and rendered unremarkable mental status findings. Id. at 295. At this appointment, Wesley requested a letter for her Social Security application stating that she was in treatment.

Dr. Contreras's notes describe Wesley as "improved" in February 2013, "stable" in August 2013, and "stable on treatment" in January 2014. This is in stark contrast to Dr. Contreras's opinion in August 2013 and April 2014 that Wesley was suffering from a loss of almost all areas of vocational functioning. The results of Wesley's mental status examination in January 2014 were unremarkable: Wesley was "alert and oriented," her mood was "pleasant," her speech was "coherent," and she denied suicidal and homicidal ideation. Id. at 295. Moreover, Dr. Contreras opined that Wesley had "no/mild loss" with regards to understanding, remembering, and carrying out simple work instructions. Id. at 300. The record furthermore depicts the treatment relationship as sporadic, with Dr. Contreras describing Wesley as "stable" despite a six-month gap between appointments. Accordingly, because Dr. Contreras's assessments of marked and extreme impairments are inconsistent with her own treatment notes, the ALJ properly weighed her opinions regarding Wesley's work-related limitations.

The ALJ's failure to recreate robotically the structured analysis in 20 C.F.R. § 416.927(c) is not reversible error. "Remand is unnecessary" where "application of the correct legal standard could only lead to one conclusion." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (internal

quotation marks omitted). The ALJ rejected Dr. Contreras's opinion in large part because it was inconsistent with the medical evidence of record (factor 4). He did not specifically discuss the other factors in 20 C.F.R. § 416.927(c). But even if the ALJ considered the other factors, he would have inevitably come to the same conclusion. Factors 1 and 2 examine the length and nature of the treatment relationship and the frequency of examinations. Although Wesley's appointments with Dr. Contreras began in February 2010, the record documents only infrequent visits during the relevant period: February 2013, May 2013, August 2013, and January 2014. The gap in treatment between August 2013 and January 2014 undermines Dr. Contreras's analysis. Without regular opportunities to assess Wesley's progress, Dr. Contreras lacked the kind of longitudinal perspective on Wesley's impairments that would render a treating source's opinions more reliable than other medical opinions. In short, factors 1 and 2 support the ALJ's decision. Although the ALJ did not reference factor 3 (the evidence that supports the treating physician's report) or factor 5 (the specialization of the treating physician in contrast to the condition being treated), his failure to do so does not require remand.

Dr. Contreras's assessment was also contradicted by the consultative examiners' findings. Dr. Broska concluded that Wesley had no limitation in following and understanding simple directions; a mild limitation in maintaining attention and concentration and learning new tasks; a mild-to-moderate limitation making appropriate decisions, relating adequately with others, and appropriately dealing with stress; and a moderate limitation in her ability to maintain a regular schedule. See id. at 235–36. Dr. Broska's assessment was supported by normal mental status examination findings, including normal speech and thought processes, an average cognitive function with appropriate fund of knowledge, and mildly impaired memory, attention and concentration. See id. at 234–35. Wesley had also informed Dr. Broska that she was capable of

performing a broad spectrum of activities of daily living, including independently using public transportation, caring for her personal needs, cooking, and cleaning. Wesley's ability to engage in these activities of daily living is supported by Dr. Contreras's treatment note in February 2013 that she was coping better with all of her life issues. Dr. Broska's findings and conclusions are also consistent with the normal findings from Dr. Contreras's January 2014 mental status evaluation. Wesley cites Dr. Broska's opinion that the results of the examination were "consistent with psychiatric problems," which may "interfere with her ability to function on a daily basis without mental health treatment," as support for Dr. Contreras's August 2013 and April 2014 vocational assessments. Id. at 236. But Dr. Broska's conclusion emphasized mild impairments (with the assumption that Wesley would continue mental health treatment), whereas Dr. Contreras's opinions precluded all mental, work-related functioning. Therefore, Dr. Broska's findings were supported by substantial evidence in the record, and the ALJ gave her opinion appropriate weight.

Furthermore, Wesley's reliance on Dr. Harding's opinion as support for marked psychological limitations is misplaced. After reviewing the medical record and Dr. Broska's conclusion, Dr. Harding asserted that Wesley was able to understand, carry out, and remember simple instructions and work-like procedures, to maintain attention and concentration for at least two hours, and to sustain a normal workday at a consistent pace. See id. at 107–08. Dr. Harding furthermore noted that because Wesley would have difficulties in responding to supervisors and coworkers, as well as dealing with the public, she would require a low contact personal setting. Although the ALJ did not expressly name Dr. Harding in his decision, the ALJ's RFC determination is incorporates much of Dr. Harding's assessment.

The ALJ also assigned proper weight to the opinion of Ms. Branas, who is a licensed social worker and a mental health therapist but not a medical expert. Social workers are "other sources," as opposed to medical sources, under the Regulations. 20 C.F.R. § 416.913(d)(3). In weighing the opinions of "other sources," the ALJ must use the same factors for the evaluation of the opinions from "acceptable medical sources" enumerated in 20 C.F.R. § 404.1527(d). See Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010). The ALJ is free to conclude that the opinion of a licensed social worker is not entitled to any weight but if he chooses to assign no weight, he must explain that decision. See id.

The ALJ gave "no weight" to Ms. Branas because (1) "the therapist had seen the claimant twice in the past year," and (2) Ms. Branas's opinion of marked limitations was "at odds with Dr. Contreras's treatment notes documenting the stable nature of the claimant's condition." AR at 17. As the Commissioner concedes, the ALJ's description of the frequency of Ms. Branas's relationship with Wesley was inaccurate—instead of biannual appointments, the record shows that the appointments took place on a bimonthly basis. See 315–18. But this error in the regularity of Wesley's visits with Ms. Branas would not have changed the ALJ's ultimate determination that Wesley was not disabled. See Zabala, 595 F.3d at 409 (remand was not necessary where missing or excluded evidence would not have changed the ALJ's ultimate finding that the plaintiff was not disabled). As discussed above with regards to Dr. Contreras's opinions, Ms. Branas's assessment of marked impairments in almost all aspects of work-related functioning is not supported by evidence in the record that suggests Wesley's condition was either stable or improving. See AR at 292 (in February 2013, "[patient] has been coping better with all of her life issues" and "is improved"); 294 (in August 2013, patient "has been reading her self help book" and "is stable"); 295 (in January 2014, "currently stable on treatment" and "is

stable"); 300 (evaluating Wesley as having "no/mild loss" with regards to understanding, remembering, and executing short, simple instructions as of April 2014); 335 (evaluating Wesley as having "no/mild loss" with regards to understanding, remembering, and executing short, simple instructions as of May 2014).

Wesley's argument that the ALJ erred by failing to consider the side effects of her medication is similarly unavailing. Specifically, the ALJ accorded no weight to Dr. Contreras's and Ms. Branas's references to the side effects of her medication (including lethargy, fatigue, and drowsiness) in their respective Medical Source Statements because there was contradictory or no supportive evidence. Neither Dr. Contreras nor Ms. Branas indicated in their treatment notes that Wesley complained of side effects.

Accordingly, the ALJ correctly applied the treating physician rule and assigned proper weight to the opinions of Dr. Contreras and Ms. Branas. The ALJ's RFC determination rests on substantial evidence and there is no basis to set it aside.

## IV.    The ALJ's Step Five Analysis

In Wesley's initial motion for judgment on the pleadings, she contended that the ALJ's analysis at Step Five was improper because (1) he "improperly accepted the testimony of Dr. Taitz as a Vocational Expert" and (2) none of the jobs cited by the ALJ was compatible with his RFC. Pl.'s Mem. of Law at 13 (ECF No. 11). On February 6, 2017, Wesley withdrew her first argument, conceding that "Dr. Taitz was properly sworn in and accepted as a vocational expert." Feb. 6, 2017 Pl.'s Ltr. (ECF No. 15).

Wesley's second objection is meritless because the jobs cited at Step Five of the ALJ's analysis did match his RFC determination. The ALJ indicated that based on the testimony of the vocational expert, a claimant with Wesley's RFC could work as a cleaner in a hospital setting, a

cleaner in an industrial setting, a mail clerk, and a marker. See id. at 19. The vocational expert

testified that none of these jobs was an assembly line job. Id. at 71. Although the ALJ's RFC

states explicitly that Wesley was "unable to do *non*-assembly line work," id. at 15 (emphasis

added), his questioning of the vocational expert at the hearing and the RFC itself make clear that

"*non*-assembly line work" was a typographical error and that he actually found Wesley to be

unable to perform assembly line work. The hypothetical that the ALJ presented to the vocational

expert limited the hypothetical claimant to "no working *in tandem* with coworkers and *no*

*assembly line work*." Id. at 70 (emphasis added). The vocational expert then confirmed that the

jobs he identified (hospital cleaner, industrial cleaner, mail clerk, and marker) did not involve

assembly line work. See id. at 71. The ALJ's RFC determination accordingly limited Wesley to

"only occasional contact with supervisors, coworkers, with whom she would not work *in*

*tandem*," id. at 15 (emphasis added), that is, she could not do assembly line jobs. The cited jobs

were therefore compatible with the ALJ's RFC conclusion.

## CONCLUSION

For the reasons stated above, I recommend that Wesley's motion for judgment on the

pleadings (ECF No. 10) be DENIED and the Commissioner's cross-motion for judgment on the

pleadings (ECF No. 13) be GRANTED.

DATED:     April 12, 2017
          New York, New York

_____
SARAH NETBURN
United States Magistrate Judge

*         *         *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO
THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the Daniel P. Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).